# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5853 | **DATE** | 8/10/2004 |
| **CASE TITLE** | Phalice Tate vs. Washington Mutual | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____ .
(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____ .
(4) ☐ Ruling/Hearing on _____ set for _____ at _____ .
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____ .
(7) ☐ Trial[set for/re-set for] on _____ at _____ .
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____ .
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (Doc. No. 67-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | 3 | **Document Number** |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | AUG 1 1 2004 | |
| | Notified counsel by telephone. | | date docketed | 79 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | 8/10/2004 | |
| | | 2004 AUG 10 PM 5:01 | date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PHALICE TATE, | ) | DOCKETED |
| Plaintiff, | ) | AUG 1 1 2004 |
| v. | ) No. 02 C 5853 | |
| WASHINGTON MUTUAL, | ) Judge Rebecca R. Pallmeyer | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

From August 2001 until her termination the following June, Plaintiff Phalice Tate worked as a "call agent," handling calls from agents and customers of Defendant Washington Mutual's mortgage loan business. In this lawsuit, Tate, an African-American woman, alleges that her discharge was a product of race discrimination and retaliation. Defendant now moves for summary judgment, arguing that the undisputed facts establish that the reason for Ms. Tate's discharge was her refusal to follow one of the company's important call handling policies, not her race. Washington Mutual also contends that she has waived her retaliation claim. For the reasons set forth below, the motion is granted.

### FACTS

The facts set forth here are compiled from the parties' statements, submitted pursuant to this court's Local Rule 56.1, and supporting materials. After responding to an online employment ad, Tate was hired on August 27, 2001 as an entry level call agent in Washington Mutual's Customer Service Center (CSC). (Tate Dep. at 21-22; Exhibit A to Defendant's Statement of Material Facts in Support of its Motion for Summary Judgment (hereinafter, "Def.'s 56.1 Stmt.") ¶ 25.) The CSC provides customer service support to Washington Mutual loan agents, as well as the company's external customers. (Id. ¶ 3.) According to David Mahmud, Director of the CSC, (Def.'s 56.1 Stmt.), as an entry level call agent, Plaintiff was expected to field customer calls, help callers resolve problems with the company's internet-based computer database system, and, if

79

necessary, refer callers to a higher-level support service for more difficult problems. (*Id.* ¶ 6 citing Mahmud Decl., Ex. G to Def.'s 56.1 Stmt.)

The CSC frequently receives calls from customers who have called the wrong support service. (Def.'s 56.1 Stmt. ¶ 12.) Under Washington Mutual policy, when this type of call occurs, the call agent who receives the call is expected to transfer the call to the appropriate support service using the "warm" method of call transfer. (*Id.*) According to Washington Mutual, a proper "warm transfer" requires the call agent to: dial the appropriate person or help desk; wait with the customer on the line for the call to be answered; introduce the customer to the new call agent; briefly explain the customer's problem; and then terminate her participation in the call. (*Id.*)

During Tate's tenure with Washington Mutual, her direct supervisor, also referred to as a "team lead," was Robert Jones. (*Id.* ¶ 5.) Initially, Jones' supervisor was the Service Execution Manager, Mary Kuppe, who reported to the Director of the CSC. (*Id.*) In November 2001, Steven Durrbeck replaced Kuppe as Service Execution Manager, and in March 2002, Daud Mahmud became Director of the CSC. (*Id.*)

Prior to starting her duties as a call agent, Tate attended a three-day training course on mortgage banking in Illinois, followed by a week-long training session in Seattle that was intended to help her learn how to answer help desk calls and to familiarize her with the computer applications used to track customer calls. (Tate Dep. at 43; Def.'s 56.1 Stmt. ¶¶ 26-27.) In addition to the formal training sessions, Tate also received on-the-job training from her team leads. (Def.'s 56.1 Stmt. ¶ 27.)

**Tate's Performance at Washington Mutual**

During her 10-month tenure with the company, Tate received a series of written notices about her performance. The first, a written "Notice of Concern" submitted by Mary Kuppe, stated that Kuppe met with Tate on October 5, 2001 to discuss issues with her attendance as well as the fact that cell phone use is prohibited while on duty. (Performance Improvement Notice Oct. 5,

2

2001, Ex. 4 to Tate Dep.) Washington Mutual also claims Kuppe gave Tate a verbal warning for leaving work early on October 5, 2001. (Def.'s 56.1 Stmt. ¶ 29.) Tate admits to having left work early that day to pick up her daughter from day care. (Plaintiff's Answers to Defendant's Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment (hereinafter, "Pltf.'s Ans. to Def.'s 56.1 Stmt."), ¶ 29.) She also admits to having a discussion with Kuppe about the alleged unauthorized early departure, but denies receiving any warning from Kuppe about it. (Id.) Tate claims that she had obtained permission to leave early from a different supervisor. (Tate Dep. at 50.)

The next written notice regarding issues with Tate's performance was a "write-up" for incorrectly logging calls on December 6, 2001. (Memo Dec. 6, 2001, Ex. 5 to Tate Dep.) This notice also contained a handwritten comment noting a problem with the amount of time Tate spent on the phone on personal calls. (Id.) (The record does not identify the author of this handwritten notation.) Tate admits that team lead Rob Jones spoke with her about logging calls and admits to having signed this document. (Pltf.'s Ans. to Def.'s 56.1 Stmt. ¶ 31.) She denies that they discussed the amount of time she spent on personal calls, however, and asserts that the handwritten comment about that matter did not appear on the document when she signed it. (Tate Dep. at 62.)

Rob Jones issued a "Notice of Concern" regarding Tate's performance on January 22, 2002, in which he commented about excessive numbers of outgoing phone calls and about the amount of time that Tate spent in "AUX" and "After Call" modes.[1] (Performance Improvement Notice Jan. 22, 2002, Ex. G to Tate Dep.) Tate admits to having received and signed the January 22 notice, in which Jones noted that she had been given written feedback on the issue of excessive outgoing calls just eleven days earlier, on January 11. (Pltf.'s Ans. to Def.'s 56.1 Stmt. ¶ 34.)

---

[1] " 'AUX' refers to the time a call agent spends in company meetings or for such things as restroom breaks or getting coffee." (Def.'s 56.1 Stmt. ¶ 9.) " 'After-call' is time the call agent spends making a record of calls received." (Id.)

3

Tate also admits to having received a copy of the CSC Departmental Guidelines on February 5, 2002. (Pltf.'s Ans. to Def.'s 56.1 Stmt. ¶ 28.) This document included a description of the company's "Warm Transfer" policy, (Washington Mutual CSC Departmental Policy at WM000094, Ex. 3 to Tate Dep.), as well as the policy prohibiting call agents at Tate's level from using personal laptops computers while on duty. (*Id.* at WM000093.) Nevertheless, on February 7, 2002, Jones and Alexandro Ho, another team lead, issued a written warning to Tate for bringing her personal laptop computer to work in violation of the company policy. (Performance Improvement Notice Feb. 7, 2002 Ex. 7 to Tate Dep.) Tate claims that she brought the computer to work so that a co-worker could fix it for her. She wrote a comment on the written warning expressing her disagreement with her supervisors' complaints and claiming that she was being "picked on" because she "speaks her mind." *(Id.)*

In late March or early April 2002, Tate submitted a written complaint to Marsha McMahon, the company's Employee Relations consultant, regarding behavior of her fellow employees on the Seattle training trip they had taken in September 2001. (Tate Dep. at 85.) Tate claimed that several co-workers had taken her to a gay bar for drinks and that while there, the co-workers discussed how to get the drug "Ecstasy." (Pltf.'s Ans. to Def.'s 56.1 Stmt. ¶¶ 38-39.) Tate also complained that one of her co-workers came to a training session smelling of vomit and alcohol. (McMahon Decl. ¶ 5, Ex. I to Def.'s 56.1 Stmt.) Tate testified that she had informed her supervisor, Kuppe, about this incident back in October 2001 and that, after that time, her managers had started mistreating her in retaliation for reporting the incident. (Tate Dep., at 76.) When asked to describe how Rob Jones mistreated her, Tate stated that "every little thing he was just on me about whereas he was not with everyone else." (*Id.*, at 77.) Tate's only specific example of this mistreatment was Jones's monthly conversations with her about spending too much time in the bathroom. (*Id.*) Tate also alleges that she was denied attendance at a week-long training session in April 2002 to take place in Irvine, California on the company's computer systems. (Tate Dep.,

at 114.)

McMahon met with Tate to review her complaint and promised to get back to her after conducting an investigation. (McMahon Decl. ¶ 6.) McMahon claims that she spoke with all the employees who were present at the bar when the alleged incident occurred and that "all of them denied that the discussion about Ecstacy had taken place as Tate described it," although her statement did not elaborate as to how the other employees described the conversation. (Id.) McMahon also claims that Alex Ho told her that the co-worker Tate complained about was ill while at training, not drunk. (Id.)

Washington Mutual asserts that Tate was cited for inappropriate use of language in May. (Performance Improvement Notice May 22, 2002, Ex. 9 to Tate Dep.) A written "Notice of Concern" dated May 22, 2002 was issued by Tate's manager, but Tate denies receiving it and no copy of the document signed by Tate appears in the record. (Id.) Washington Mutual alleges that one of Tate's co-workers, Debbie Caldwell, had complained to Durrbeck that Tate had threatened members of her work group, warning them that if she found out who had reported her bad language, she would take action against them. (Durrbeck Decl. ¶ 5, Ex. H to Def.'s 56.1 Stmt.) As a result, on May 24, 2002, Rob Jones issued a written warning citing Tate for continued use of inappropriate language and threats made to her co-workers. (Performance Improvement Notice May 24, 2002, Ex. 10 to Tate Dep.) Tate refused to sign the document, but responded with a handwritten comment on the document that the allegations were not true. (Id.)

**Events Leading Up to Discharge**

By early June, Durrbeck's dissatisfaction with Tate's performance escalated and he recommended to Mahmud, the department Director, that Tate be terminated. (Mahmud Decl. ¶ 25, Ex. G to Def.'s 56.1 Stmt.; Durrbeck Decl. ¶ 6.) After reviewing the internal documentation of Tate's performance issues, Mahmud decided that Tate should instead be counseled regarding her performance issues and given an opportunity to improve. (Mahmud Decl. ¶ 25; Durrbeck Decl.

5

¶ 6.) Durrbeck then issued a "Performance Improvement Follow Up" notice which was presented to Tate at a meeting on June 3, 2002 at which her direct supervisor, Jones, was also present. (Durrbeck Decl. ¶ 7; Performance Improvement Followup Jun. 3, 2002, Ex. 11 to Tate Dep.) This document noted several areas of needed improvement including: unauthorized cellular phone use during business hours; excessive incoming and outgoing calls; excessive absences; and failure to execute the "Warm Transfer" policy. (Performance Improvement Followup Jun. 3, 2002.) The document also clearly stated that any further violations of these policies would result in termination. (*Id.*)

While conducting routine monitoring of agent telephone service that very same day, Durrbeck overheard what he characterized as a "cold transfer" by Tate. (Def.'s Stmt. of Facts, ¶ 56.) Specifically, while monitoring Tate's phone line, Durrbeck heard a customer conversing with a call agent at a different help desk without Tate's involvement, demonstrating that Tate had not "signed off" the call as required by the "warm transfer" policy. Durrbeck approached Tate's desk and observed her with her CSC headset on one ear and her personal cell phone to the other ear, engaged in a conversation on her personal telephone. (*Id.* ¶ 57.) Durrbeck asked her if she was on a customer call and she replied that she was waiting for someone to pick up, and then acted as though she were speaking to someone who had just come on the line. (*Id.*) When Durrbeck returned to his desk and resumed monitoring Tate's line he concluded that Tate had not, in fact, picked up a new call because, as before, he heard the same customer and call agent conversing. (*Id.* ¶ 58.) Durrbeck concluded that Tate was attempting to make him believe that she had made a warm transfer when she had not. (*Id.* ¶ 57.) Durrbeck documented this incident in an "Employee Communication Log." (Employee Communication Log, Ex. 13 to Tate Dep.) Later that day, when Durrbeck asked her about this phone conversation, Tate denied the allegation and asserted that she had transferred the call in accordance with the company's warm transfer policy. (Durrbeck Decl. ¶ 19.) Later that day, Durrbeck approached Tate and asked her to explain the warm transfer

6

policy, which she did correctly. (Def.'s 56.1 Stmt. ¶ 59.) Durrbeck issued a written "Performance Improvement Followup" regarding this interaction. (Performance Improvement Followup Jun. 5, 2002, Ex. 14 to Tate Dep.) The court notes that this document does not bear Tate's signature.

Durrbeck continued to monitor Tate's phone line. On June 5, 2002 Durrbeck reviewed a tape of Tate's calls and concluded from the recording that, out of nineteen calls recorded, Tate had made two cold transfers, had taken five personal calls and had deliberately dropped a legitimate customer call to continue a personal call. (Durrbeck Decl. ¶ 20.) A transcript of the recording was provided in the record. (Durrbeck Decl., Ex. 1).[2]

On June 6, 2002, Tate and two co-workers returned late from lunch. (Tate Dep. at 150-52.) Tate received a written performance notice regarding this issue. (Performance Improvement Followup Jun. 6, 2002, Ex. 16 to Tate Dep.) Tate claims that the two co-workers who returned from lunch late along with her, Christine Massey and Debbie Caldwell, were not given written notices. (Tate Dep. at 152.) Durrbeck asserts that he gave verbal reprimands to Ms. Massey and Ms. Caldwell later that day. (Durrbeck Decl. ¶ 23.) Tate alleges that this differential treatment was a function of race discrimination. (Plaintiff's Memo of Law in Opposition to Washington Mutual's Motion for Summary Judgment (hereinafter "Pltf.'s Opp. Memo"), at 7.)

On June 7, 2002, there was an act of vandalism in the Washington Mutual parking lot in which someone spray-painted the back of Rob Jones' car. According to Durrbeck, two Washington Mutual employees suspected that Tate was the perpetrator. (Durrbeck Dep. 7/15/03 at 279-281,

---

[2] Plaintiff objects to the court's consideration of these transcripts on the basis that they were not produced during discovery. She claims the transcripts are not trustworthy, but offers no support for this assertion other than the fact that she does not know how they were prepared and is suspicious about Durrbeck's involvement in the transcription. Defendant asserts that the tapes themselves were produced during discovery and, at the court's request, Defendant provided the tapes for the court's consideration. Defendant's failure to provide an affidavit from the individual(s) who prepared the transcripts is disappointing. Nevertheless, having listened to the tapes, the court is satisfied that the transcripts are accurate records of the taped conversations. Notably, Plaintiff herself has not identified any inaccuracies in the transcripts. *Cf. United States v. Crowder*, 36 F.3d 691, 697 (7th Cir. 1994). Her objection is overruled.

Ex. 2 to Pltf.'s 56.1 Stmt.) Durrbeck recounted that Lisa Froustis, a CSC employee, and an unidentified male CSC employee told him they observed Tate move her car from the front of the building where she usually parked, to the back of the building near where Rob Jones's car was parked. (*Id.*) The employees observed Tate removing something from the back of her vehicle, proceeding behind Jones's vehicle, then returning to her own vehicle and exiting the parking lot. (*Id.*) When employees went to see what had happened, they found the spray paint on the back of the car. (*Id.*) Durrbeck called Washington Mutual's security contractor; staff there advised him to contact the police. (*Id.*)

By this time, Durrbeck was sufficiently concerned about Tate's performance that he wrote a memo to Mahmud listing the various written and verbal performance notices Tate had received since her date of hire and recommending that Tate be terminated. (Durrbeck Memo Jun. 13, 2002, Ex. 15 to Durrbeck Dep., Ex. 2 to Pltf.'s 56.1 Stmt.) The memo listed the various written and verbal performance notices Tate had received since her date of hire. (*Id.*) The memo also outlines several areas in which Tate was not meeting Washington Mutual's performance expectations and policies. (*Id.*) One area of concern was the number of "Redirect on No Answer" (RONA) calls. Durrbeck explained that a RONA call is attributed to a call agent when a call is put through to that agent's line and the agent does not answer after four rings and, as a result, the call is redirected to another available agent. (Durrbeck Dep. 7/15/3 at 210, Ex. D to Def.'s 56.1 Stmt.) Tate had received 86 RONA calls in a five-month period, compared to the company policy establishing the acceptable limit on RONA calls at 15 within any given six-month period. (*Id.*) The memo also states that Tate had missed 16 days of work within a five-month period, well in excess of company policy, under which six unscheduled absences in twelve months is considered excessive. The court notes that Tate disputes this; she contends that the 16 alleged absences include excused absences such as vacation days, holidays, and sick time. (Def.'s Materials, Ex. A.,Tate Dep. at 136.)

On June 17, 2002, Durrbeck monitored Tate's performance by listening to her telephone line. He overheard what he regarded as a "cold transfer" of a call and other violations of Washington Mutual's policies; for example, she made two calls of a completely personal nature to a male acquaintance.[3] (Durrbeck Dep. 7/15/03 at 180-181, Ex. D to Def.'s 56.1 Stmt.) Durrbeck concluded that Tate's conduct represented a purposeful disregard of company policy. (*Id.*) He then recommended to Director Mahmud that Tate be terminated, Mahmud agreed, and Tate was dismissed on that date. (Def.'s 56.1 Stmt. ¶ 63.)

Tate's behavior after her discharge is not technically relevant to the issues before the court, but the court notes that Defendant's assessment of her conduct is arguably reinforced by the series of threatening and inflammatory e-mail communications Tate sent to Washington Mutual

---

[3] The conclusion that Tate was engaged in unauthorized personal calls is unmistakable. Here is an example of a conversation Durrbeck overhead:

Tate: May I speak with Dion?
Caller: Yeah this is me.
Tate: This is Kelly.
Caller: Hey, my Boo, what's up?
Tate: Nothin', nothin' at all.

Later in the conversation:
Caller: So what do you do?
Tate: Network analyst, network analyst.
Caller: Tell me something about you girlie?
Tate: What do you want to know?
Caller: I mean, whatever . . . whatever you want to tell me. I'm pretty sure all of it might be interesting.
Tate: When do you . . . Uh, are you off today?
Caller: Uh huh.
Tate: What are you doing later this evening?
Caller: Huh?
Tate: What are you doing later this evening?
Caller: Uh, probably nothing. I don't know yet . . . What you doing this evening?
Tate: Waiting on you to come over.

(Tate Call Transcript 6/17/2002, Attachment 2 to Durrbeck Decl.)

employees after her employment was ended.[4]

**Other Washington Mutual Employees**

Tate claims that four similarly situated-employees of Washington Mutual who were not members of a protected class were given more favorable treatment. The court will briefly review the available facts regarding these employees and their relationships with Washington Mutual CSC.

Christine Massey is a white female employed by Washington Mutual as an entry level call agent. (Response to Plaintiff's Local Rule 56.1(a) Statement of Facts (hereinafter "Def.'s Resp. to Pltf.'s 56.1") ¶ 15.) There is no other evidence in the record regarding Massey's tenure with the company, her job qualifications, or her job performance. Debbie Caldwell is a white female employee of the Washington Mutual CSC. (Def.'s Resp. to Pltf.'s 56.1 ¶ 18.) It is not clear from the record whether her job responsibilities are comparable to those of Tate, but, in her deposition testimony, Tate refers to Caldwell as "management." (Tate Dep. at 152.)

David Verde is a white male who was hired by Washington Mutual CSC in September 2001. (Def.'s Resp. to Pltf.'s 56.1 Ex. 4.) Verde received a poor performance evaluation from Washington Mutual in July 2002, followed by a series of written performance notices. (Pltf.'s 56.1 Stmt., Exs. 1-3.) Verde had several performance issues for which he was cited, including inappropriate language, threatening behavior, inappropriate comments to customers, excessive outgoing calls, not following appropriate procedures for calls requiring escalated support, and

---

[4] On July 11, 2002, Tate issued an e-mail to several Washington Mutual employees in which she alleged that CSC managers were "being questioned about continuous illegal, unethical and immoral acts" and that Rob Jones was making more money in overtime than his regular salary; she observed that "the reason that I know this is because Rob left his paycheck stub on his desk and I looked at it was shocked!" (Tate E-mail 7/11/02 at WM000043, Ex. 20 to Tate Dep.) She also accused Rob Jones of being intoxicated and calling a Washington Mutual employee a "Stank, Whore, Bitch" for refusing to go out with him. (*Id.* at WM000046.) She accused Rob Jones of having an affair with Lisa Froutis. (*Id.* at WM000047.) In an August 19th e-mail Tate sent, titled "What the Fucckkkk . . . .," she alleged that CSC managers altered employee's time cards. (Tate E-mail 8/19/04, Ex. 26 to Tate Dep.) An August 29, 2002 e-mail message Tate sent to an unidentified Washington Mutual employee that said: "I found out why you were really let go from Bank One after 13 years of service there. I will be announcing that in my NEXT email." (Tate E-mail 8/29/02, Ex. 25 to Tate Dep.)

10

creating duplicate tickets. (*Id.*) Verde was ultimately terminated on December 27, 2002 after just over a year with the company. (Def.'s Resp. to Pltf.'s 56.1 ¶ 40.)

Michael Largent is a white male hired by Washington Mutual as an entry level call agent in July 2001. (Def.'s Resp. to Pltf.'s 56.1 ¶ 41; Performance Management Form for Michael Largent, Ex. 7 to Plaintiff's Confidential Document Exhibits.) Over the course of several months, Largent was reprimanded several times, verbally and in writing, for tardiness and was ultimately discharged from the company on November 12, 2002.

## DISCUSSION

Plaintiff's complaint alleges that she was a victim of racial discrimination and retaliation. Defendant Washington Mutual seeks summary judgment on both claims. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether there is a genuine issue of fact, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Plaintiff's Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment notes that in employment discrimination cases such as this, "this standard is applied strictly, as these cases often involve credibility issues typically reserved for a jury." *Palao v. Fel-Pro., Inc.*, 117 F. Supp. 2d 764, 766 (N.D. Ill. 2000).

As explained below, the court finds that Tate has not established a prima facie case of employment discrimination and therefore grants the motion for summary judgment on this claim. Because the Plaintiff failed to address the retaliation claim in her response to Defendant's Motion for Summary Judgment, the court deems that claim waived.[5]

---

[5] Plaintiff asserted that Defendant retaliated against her for her complaints about references by co-workers to illegal drug use during an out-of-town training trip. Defendant asserts (continued...)

11

**I.     Employment Discrimination on the Basis of Race**

Tate claims that she was terminated from her employment with Washington Mutual because she is African-American. In order to survive a motion of summary judgment, Tate must put forth either direct evidence that her termination was the result of discrimination, or use the indirect "burden-shifting" approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. Plaintiff has acknowledged that she has no direct evidence of discrimination and therefore relies on the burden-shifting approach. (Pltf.'s Opp. Memo, at 4.) To prevail under that analysis, the plaintiff must establish a prima facie case of discrimination by producing evidence that (1) she is a member of a protected class, (2) she was satisfying the employer's legitimate performance expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees were treated more favorably. *Oest v. Ill. Dep't. of Corr.*, 240 F.3d 605, 612 (7th Cir. 2001).

### A.     Tate Is a Member of a Protected Class and Was Subjected to Adverse Employment Action

As an African-American, Tate is a member of a protected class. (Def.'s Resp. to Pltf.'s 56.1 ¶ 3.) It is also undisputed that her discharge constitutes an adverse employment action. (*Id.*) Therefore, the first and third required elements are met.

### B.     Satisfaction of Employer's Legitimate Performance Expectations

The second required element of the burden-shifting approach is that the plaintiff establish that she was satisfying the employer's legitimate performance expectations at the time of termination. Washington Mutual points to substantial evidence that Tate was not performing her job duties satisfactorily at the time of her termination and asserts that Tate cannot establish a prima

---

[5](...continued)
that it investigated at least one of these complaints by interviewing the co-workers involved. Without commenting on the investigation, the court notes that Plaintiff's complaints about this matter, however appropriate, are not tantamount to complaints about conduct rendered unlawful by Title VII.

facie case of discrimination as a result of this poor performance record. As the Seventh Circuit has observed in *Peele v. Country Mutual Insurance Co.;* "If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be 'put to the burden of stating the reasons for [her] termination.'" 288 F.3d 319, 328 (7th Cir. 2002) (citing *Coco v. Elmwood Care, Inc.* 128 F.3d 1177, 1179 (7th Cir. 1997)).

Plaintiff argues that she does not have to provide evidence that she was meeting the legitimate performance expectations of her employer, citing two Seventh Circuit cases: *Flores v. Preferred Technical Group*, 182 F.3d 512 (7th Cir. 1999) and *Oest*. *Flores* and *Oest*, among other cases, illustrate that where Plaintiff's performance deficiencies are no different from those of other workers, the employer may not be entitled to prevail at this stage of analysis.

In *Flores*, the plaintiff was the only employee to be terminated out of a group of co-workers who stopped work to protest the company's plans to initiate strict enforcement of a rule prohibiting breaks. 182 F.3d at 513. In her federal lawsuit for national origin discrimination, the district court granted summary judgment for her employer on grounds that plaintiff could not have been meeting her employer's reasonable expectations while on a work stoppage. The Seventh Circuit affirmed, but not on that basis: "It makes little sense in this context to discuss whether she was meeting her employer's reasonable expectations. None of the employees who joined the coffee room [work stoppage] fracas were meeting [the employer]'s reasonable expectations." *Id.* at 515. Instead, the Court of Appeals observed, the evidence established that plaintiff was discharged because she was perceived as the ringleader of the protest, not because she was Hispanic. *Id.* Tate's situation is distinguishable from that in *Flores*, because unlike plaintiff there, Tate was not singled out as the only person to be terminated among a group of employees all of whom had exhibited the same undesirable behavior.

In *Oest*, similarly, the plaintiff, a corrections officer, acknowledged performance problems, including poor attendance, mis-counts of inmates, failures to follow orders, and inappropriate

13

language, but she claimed that male employees guilty of similar deficiencies were not disciplined. As in *Flores*, the Seventh Circuit concluded that a discussion of whether plaintiff was meeting reasonable expectations was not useful if the plaintiff could show that her employer applied those performance expectations in a discriminatory manner. 240 F.3d at 612 n.3. As the Seventh Circuit explained in another context, "When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the plaintiff [may] establish a prima facie case by establishing that similarly-situated employees were treated more favorably." *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002). As explained here, Plaintiff here attempts to demonstrate such disparate treatment.

### C. The Similarly Situated Employees

Tate argues that there were four similarly situated Washington Mutual employees who violated the company's policies and were treated more favorably: Christine Massey, Debbie Caldwell, David Verde, and Michael Largent. (Pltf.'s Opp. Memo, at 2.) "In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citing *Spath v Hayes Wheels Int'l-In., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000)). "A plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Id.* at 617. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*

Tate claims that Christine Massey and Debbie Caldwell were similarly situated employees who were treated more favorably with respect to attendance. Tate, Massey, and Caldwell all returned from lunch late one day, but Tate alone received a written performance notice for the infraction. (Def.'s Materials, Tate Dep., at 152.) In the court's view, the fact that co-workers were

14

treated less harshly for a similar disciplinary infraction has little relevance to the question whether Plaintiff's *discharge* was a function of discrimination. Not every action that makes an employee unhappy is actionable, see *Fyfe v. City of Fort Wayne*, 241 F.3d 597, 602 (7th Cir. 2001); *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993), and the fact that Plaintiff received a write-up when her co-workers were only orally reprimanded does not appear to be actionable. In any event, Plaintiff here challenges her discharge as a function of race discrimination, and she does not contend that this single disciplinary write-up tipped the balance.

Plaintiff also identifies Michael Largent and David Verde as similarly-situated employees who received more favorable treatment. Significantly, both Largent and Verde were also discharged. With respect to Largent, the record shows he was employed as an entry level call agent in July 2001, was promoted to "team lead" in April 2002, but was ultimately discharged for excessive tardiness in November 2002. (Performance Management Form for Largent at WM000152, Ex. 7 to Plaintiff's Confidential Document Exhibits; Def.'s Resp. to Pltf.'s 56.1 ¶¶ 40-41.) Largent can not be considered a "similarly situated" employee relative to Tate for two reasons: first, he was functioning at a higher level within the organization when his disciplinary issues led to his dismissal, and second, unlike Tate, Largent's performance issues did not relate to his handling of customer calls. Although Largent was originally hired as an entry level call agent, he was promoted to "team lead" in April 2002. Largent received positive feedback in his performance review on his customer handling skills: "Michael interacts well with customers and provides good customer service." (*Id.* at WM000151.) Largent had significant issues with punctuality, however, as noted in the performance review. (*Id.*) According to Durrbeck, Largent was ultimately discharged for excessive tardiness. (Durrbeck Memo, Ex. 11 to Durrbeck Dep.) Durrbeck recommended that Largent be terminated because he had incurred a total of 18 tardiness episodes in less than three months which, under Washington Mutual policy, represented nine "occurrences" compared to the company, under policy which six occurrences in 12 months is deemed excessive.

15

(*Id.*)

Tate comes closer to establishing a dispute of fact with respect to co-worker David Verde. After being hired as a call agent in September 2001, Verde violated the company's policies on numerous occasions and was given many more opportunities to address his performance issues before he was ultimately discharged in December 2002. (Pltf.'s Opp. Memo, at 5.) Tate notes that Verde was put on a "performance improvement plan" and given an opportunity to address his performance issues before he was ultimately terminated from the company. (Pltf.'s Opp. Memo, at 7.) There were some similarities between Verde's performance issues and those of Tate: The company issued warnings to both employees about inappropriate language, harassing or threatening co-workers, excessive outgoing calls, and personal phone calls. (Durrbeck Dep. 9/11/2003, Ex. 3 to Pltf.'s 56.1 Stmt., Exs. 1-4.) The court notes, however, there were also a number of differences between Tate and Verde's performance problems. Unlike Verde, Tate was also cited for attendance issues (10/5/2001), logging calls incorrectly (12/6/2001), excessive time in "AUX" and "After Call" modes (1/22/2002), violation of company policy against bringing laptops to work (2/76/2002), sleeping during business hours (6/3/2002), excessive RONA calls, as well as violations of the "warm transfer" policy. (Tate Dep., Exs. 4-11, 14, 16.)

In any event, Tate has not satisfied the court that Verde received more favorable treatment. Defendant acknowledges that Tate was not put on a formal performance improvement plan. (Durrbeck Dep. 7/15/03 at 101, Ex. 2 to Pltf's 56.1 Stmt.) Defendant also admits that Verde was put on such a plan and given sixty to ninety days to improve his performance and that it agreed to provide Verde with daily reports on his performance and training. (Def.'s Resp. to Pltf.'s 56.1. ¶¶ 23, 24, 26.) Tate, too, however, was given direct feedback on her performance issues and an opportunity to improve throughout the eight-month period between her first written performance notice in October 2001 and her discharge in June 2002. As previously noted, Durrbeck had recommended that she be terminated prior to June 3, 2002, but followed Mahmud's direction to

give her another chance to improve.

Even if there were evidence sufficient to create an inference of discrimination, Defendant Washington Mutual could rebut the presumption of discrimination by proffering a legitimate reason for Tate's termination. See Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 473 (7th Cir. 2002) (where employer offers multiple independently sufficient justifications for an adverse employment action, plaintiff must cast doubt on each of them to demonstrate pretext). As noted, Washington Mutual claims that Tate was terminated for violating the company's warm transfer policy.[6] (Def.'s 56.1 Stmt. ¶ 63.) As evidence, Washington Mutual points to Durrbeck's deposition testimony in which he claims to have overheard her violating the policy while he was monitoring one of her customer calls on June 3, 2002, the same day Tate had been counseled about this very matter. Tate denies that she violated the warm transfer policy during the call that Durrbeck monitored, (Pltf.'s Ans. to Def.'s Stmt. of Facts ¶ 63), but the transcript and tape of this recorded conversation clearly support Durrbeck's version of events. It is undisputed that the policy requires the call agent to introduce the customer to the call agent receiving the transfer, then explain the customer's problem before signing off on the call. (Def.'s 56.1 Stmt. ¶ 12.) The transcript illustrates that Tate did not follow this procedure on one of the eleven calls recorded and that Tate also initiated two personal calls while on duty. (Durrbeck Decl.) Tate's discharge for violating this policy is reasonable in light of the fact that she had been warned verbally and in writing that any future

---

[6] Plaintiff challenges the veracity of statements made by Defendant's representative Mahmud regarding the reason for Tate's discharge. (Pltf.'s Opp. Memo, at 9.) According to Plaintiff, Mahmud's affidavit, which states that Tate was discharged for repeated violations of the company's warm transfer policy, contradicts his prior deposition testimony in which he stated he was not prepared to testify concerning the incident that led to Tate's discharge. Plaintiff claims the affidavit should not be credited because it is inconsistent with prior sworn testimony, citing Beckel v. Wal-mart Assocs., Inc., 301 F.3d 621, 623 (7th Cir. 2002) (holding that affidavit, when offered to contradict the affiant's own previous deposition, was so lacking in credibility as to be entitled to zero weight in summary judgment proceedings.) Notably, the deposition page she refers to is not in the record. Assuming, however, that Mahmud's testimony is as Plaintiff describes it, the court notes this subsequent affidavit, presumably given after he had an opportunity to review the circumstances of her discharge, is not inconsistent with his earlier testimony.

17

violations of Washington Mutual policies (including, but not limited to the warm transfer policy) would result in her termination. (Tate Dep., Ex.11, Ex. 14).

Plaintiff now appears to suggest that a "performance improvement plan" or some other further opportunity to turn things around would have made a difference, but nothing in this record supports that speculation. Indeed, Tate appears to have known for some time that Defendant was making a case against her. Referring to her supervisors in a personal phone conversation recorded a few weeks before she was discharged, Tate was recorded as saying: "they not doing nothing but digging a hole for themselves 'cause once I get in contact with the EEOC and they see that this documentation is bogus, and then they do try to fire me, girl it ain't nothing but money, cha-ching." (Tate Call Transcript 6/5/02, Attachment 1 to Durrbeck Decl.) Nevertheless, despite her awareness that Washington Mutual had documented her performance problems, Tate made little effort to improve, instead apparently looking forward to this lawsuit to vindicate her.

## CONCLUSION

The evidence establishes that Washington Mutual terminated Plaintiff from her position as a call agent due to repeated performance failings, including violations of its "warm transfer" policy, not because of her race. Plaintiff has not established that co-workers with similar performance records were treated more favorably. Defendant's motion for summary judgment (Doc. No. 67-1) is granted.

ENTER:

Dated: August 10, 2004

REBECCA R. PALLMEYER
United States District Judge